## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-278

**BROCK SIMON**

**VERSUS**

**FARM BUREAU INSURANCE CO., ET AL.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20170186
HONORABLE LAURIE A. HULIN, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## VAN H. KYZAR
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Elizabeth A. Pickett, and Van H. Kyzar, Judges.

**REVERSED, RENDERED, AND REMANDED.**

Kyle Sherman
Brandt & Sherman, LLP
111 Mercury St.
Lafayette, LA 70503
(337) 237-7171
COUNSEL FOR PLAINTIFF/APPELLANT:
    Brock Simon

Keith Saverio Giardina
Ryan T. Morrow
9100 Bluebonnet, Suite 300
Baton Rouge, LA 70809
(225) 293-7272
COUNSEL FOR DEFENDANT/APPELLEE:
    Beta Land Services, LLC

Charles J. Duhe, Jr.
Ryan J. Zumo
Taylor, Wellons, Politz & Duhe
8550 United Plaza Blvd, #101
Baton Rouge, LA 70809
(225) 387-9888
COUNSEL FOR DEFENDANT/APPELLEE:
    Louisiana Farm Bureau Casualty Insurance Co.
    Jeffery Doughty

**KYZAR, Judge.**

The current matter arises from an automobile accident between Plaintiff, Brock Simon, and Jeffrey Doughty, who was doing work for Defendant, Beta Land Services, Inc. (Beta), on the day of the subject accident. Plaintiff appeals the trial court's finding that Mr. Doughty was an independent contractor and its subsequent granting of a motion for summary judgment in favor of Beta on the issue of vicarious liability, dismissing Plaintiff's suit as against Beta with prejudice. Plaintiff also appeals the denial of his cross-motion for partial summary judgment on the same issue. For the reasons set forth herein, we reverse the ruling of the trial court granting Beta's motion for summary judgment. Further, we grant Plaintiff's motion for summary judgment and remand the matter to the trial court for further proceedings consistent herewith.

## FACTS AND PROCEDURAL HISTORY

On January 28, 2016, Plaintiff, Brock Simon, was involved in a motor vehicle accident wherein the vehicle he was operating was rear-ended by a vehicle owned and operated by Jeffery Doughty. At the time of the collision, Doughty worked as a landman for Beta pursuant to a written contract entitled Independent Landman Consulting Agreement. It is not disputed that just prior to the accident, Doughty had gone to a Beta location in Lutcher, Louisiana to clean out an office that had been previously used by the company. He was bringing the supplies and fixtures from that office to Beta's main office location in Lafayette at the time the collision occurred.

Plaintiff filed suit for damages against Doughty and his insurer, Farm Bureau Casualty Insurance Co., on January 3, 2017, and thereafter, amended and supplemented the suit to add Beta as a defendant. In his petition, Plaintiff alleges

that Doughty caused the accident and that at the time thereof, Doughty was an employee, agent, and/or was on a mission for Beta, rendering Beta vicariously liable for damages caused by Doughty's negligence.

Beta filed a motion for summary judgment on the issue of its vicarious liability, contending that Doughty was an independent contractor at the time of the subject collision. Plaintiff also filed a motion for partial summary judgment on the issue of Beta's vicarious liability, as well as on the issue of fault. Defendants stipulated to the fault of Doughty in causing the collision but maintained he was working as an independent contractor. Plaintiff then filed an opposition to Beta's summary judgment motion, and both parties filed reply memoranda. The only evidence submitted by either party in conjunction with their respective summary judgment motions and oppositions were: (1) Deposition testimony of Doughty; (2) the "Independent Landman Consulting Agreement" between Beta and Doughty signed December 13, 2010; and (3) an affidavit regarding work experience signed by Doughty and dated December 13, 2010, the same day he began contracting with Beta.

The motions for summary judgment were heard on December 3, 2018, following which, the trial court ruled in favor of Beta, granting its motion for summary judgment and dismissing Plaintiff's suit as against it with prejudice. The trial court signed judgment to this effect on December 20, 2018. No written reasons for judgment were issued. The judgment was certified as final, and Plaintiff filed this appeal, asserting three assignments of error:

1. The trial court erred in holding that Jeffery Doughty was an independent contractor.

2. The trial court erred in failing to hold that, at the time of the subject collision, Jeffery Doughty was acting as an agent or employee of Beta Land Services, LLC, and/or was on a mission for Beta, rendering Beta vicariously liable for his negligent acts.

2

3.    The trial court erred in failing to hold that there was a genuine issue of material fact regarding whether Mr. Doughty was an independent contractor.

## DISCUSSION

A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So.2d 880. Summary judgment is appropriate if pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as matter of law. La.Code Civ.P. art. 966; *Butterfield v. C&M Construction Co.*, 96-225 (La.App. 3 Cir. 6/5/96), 676 So.2d 659.

The burden of proof rests with the mover. La.Code Civ.P. art. 966(D). Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. *Id.* The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. *Id.*

Appellate courts review summary judgments de novo, applying the same criteria used by the trial court to determine whether summary judgment is appropriate. La.Code Civ.P. art. 966(A)(3); *Samaha*, 977 So.2d 880. However, the distinction between employee and independent contractor status is a factual determination to be decided on a case-by-case basis. *Stovall v. Shell Oil Co.*, 577

3

So.2d 732 (La.App. 1 Cir.), *writ denied*, 582 So.2d 1309 (La.1991). Generally, factual findings of a trial court are reviewed under the manifest error/clearly wrong standard. *Kibodeaux v. Progressive Ins. Co.*, 08-791 (La.App. 3 Cir. 2/4/09), 4 So.3d 222, *writ denied*, 09-472 (La. 4/17/09), 6 So.3d 794. As this matter comes before us on summary judgment, we will review whether Doughty was acting as an employee or an independent contractor for Beta based upon the undisputed material facts presented. *See* La.Code Civ.P. art. 966.

The trial court granted summary judgment on behalf of Beta. While there are no oral or written reasons, by its judgment the trial court concluded that Doughty was working as an independent contractor at the time of the subject accident, thus, dismissing Plaintiff's claims against Beta with prejudice. It is well settled that "the term independent contractor connotes a freedom of action and choice with respect to the undertaking in question and a legal responsibility on the part of the contractor in case the agreement is not fulfilled in accordance with its covenants." *Hickman v. Southern Pacific Transport Co.*, 262 La. 102, 117, 262 So.2d 385, 390 (La.1972). Unlike an employee, a pincipal generally is not liable for offenses committed by an independent contractor while performing its contractual duties, with two exceptions, one of which being if the pincipal reserves the right to supervise or control the work. *Ledent v. Guar. Nat'l Ins. Co.*, 31,346 (La.App. 2 Cir. 12/28/98), 723 So.2d 531. There is a reason for this disparate treatment; for though both servant and independent contractor are engaged in the performance of an employment for the benefit of the employer, it is the independent contractor's freedom from control which takes him out of the class of a servant and thus relieves the employer from liability. *Kibodeaux*, 4 So.3d 222. The Louisiana Supreme Court has found that the relationship of pincipal and independent contractor exists when the following conditions are met:

4

1. There is a valid contract between the parties;

2. The work being done is of an independent nature such that the contractor may employ nonexclusive means in accomplishing it;

3. The contract calls for specific piecework as a unit to be done according to the independent contractor's own methods without being subject to the control and direction of the principal, except as to the result of the services to be rendered;

4. There is a specific price for the overall undertaking; and

5. Specific time or duration is agreed upon and not subject to termination at the will of either side without liability for breach.

*Smith v. Zellerbach*, 486 So.2d 798, 801 (La.App. 1 Cir. 1986), *writ denied*, 489 So.2d 246 (La.1986) (citing *Hickman*, 262 So.2d 385).

In the instant case, neither party denies the existence of a contract between Doughty and Beta, but rather its validity in defining the relationship. The contract is entitled "Independent Landman Consulting Agreement" and was signed December 13, 2010. However, the labeling of Doughty as an "independent contractor" in the document is not dispositive of the actual nature of Doughty and Beta's relationship for the purposes of this case. As this court has stated:

> "[O]nce it is determined that an employment contract exists, for purposes of the employer's vicarious liability in tort, it is necessary to determine what *type* of employment contract exists, i.e., whether the employee is a mere servant or an independent contractor." *Hughes v. Goodreau*, 01-2107, p. 5 (La.App. 1 Cir. 12/31/02), 836 So.2d 649, 656, *writ denied* 03-232 (La.4/21/03), 841 So.2d 793 (emphasis original). Although the parties may have designated Guidry as an independent contractor in the contract, this designation is not controlling on the rights of third persons. Rather, the rights of third persons are determined by the substance of the contractual relationship, rather than the title of it. *Hughes v. Goodreau* at 659 (citing *Monsato Co. v. St. Charles Parish School Bd.*, 94-2145, pp. 5-6 (La.2/20/95), 650 So.2d 753, 756-57). The legal relationship between Guidry and the CPPJ will be determined both, "from the contract between them and from their intentions in establishing and carrying out that relationship as manifested in its performance and the surrounding circumstances." *Hickman v. S. Pac. Transport Co.*, 262 La. 102, 116, 262 So.2d 385 (1972).

*Kibodeaux*, 4 So.3d at 225.

5

As the existence of a contract is only one factor to consider in totality with the surrounding circumstances, we accordingly move to the next part of the *Hickman*, 262 So.2d 385, test. Factors two and three are generally discussed together and refer to the methods used to complete the project, the non-exclusiveness of those methods, and the degree of control exercised by the pincipal. Part three specifically focuses on the degree of control exercised by the pincipal, as well as calling for a specific piecework as a unit. *Id.* The most important inquiry to be made in determining the relationship between the parties is whether the pincipal reserved the right to control the work. *Id.* It is not the actual supervision and control that is exercised but rather it is the right to exercise control which is of primary concern. *Id.*

Beta maintains that it did not retain control over the methods used by Doughty in his day to day operations. This follows wording in the contract between Beta and Doughty so stating. It claims to have controlled only the services to be rendered by Doughty and the end product, but not Doughty's work as a landman, so as not to affect Doughty's status as an independent contractor. Beta asserts Doughty had the authority to get his work done without constant supervision from project managers, many of whom were landmen also working for Beta as supposed independent contractors. Beta asserts that Doughty knew how to research and run titles as a landman before working for Beta and that he was able to conduct his work according to his own methods.

These assertions are contradicted by Doughty's own deposition testimony, which we note was submitted by both parties in support of the cross motions for summary judgment. When asked if the clause in his contract prescribing that "**CONTRACTOR**[Doughty] shall have control and management of the project assignment and no right is reserved by **BETA** to direct or control the manner in

6

which the assignment is performed[]" accurately described his work relationship with Beta, Doughty gave the following response: "No. They pretty much would tell you the way that they would want it for the most part." As to the level of supervision of his work, Doughty testified that Beta would "tell you which way to do it or if you have five things to cure they might tell you which one to do first and show you how to do it[.]" Depending on the project, Beta would instruct him on what to do and when to do it.

Additionally, while Doughty did testify that he was trained in how to attend to duties as a landman before contracting with Beta, he also testified that he underwent training so that his work could be completed in accordance with Beta's policies and forms. Doughty also stated that he could go days or weeks without direct supervision from Beta on some jobs; however, he admitted that certain projects had daily supervision, during which Beta mandated where Doughty worked from and when he did said work. He also moved from project to project as directed by Beta, rather than being contracted to complete a specific piecework as a unit.

Further related to control and supervision, Beta contends that Doughty controlled his work schedule and did not have to punch in a time clock and was also able to work half-days. This assertion is likewise contrary to the deposition testimony of Doughty. Doughty states in his testimony that he did not perform the work on his own time. He specifically states that he was expected to be in Beta's office location every weekday from 8 A.M. until 5 P.M. if he was not out on a specific job at a parish courthouse and that he did not feel he could take un-planned half-days. When asked what would happen if Doughty decided to just take a day off or not go into to Beta's office, Doughty stated, "I never did that, I'm sure they

7

would not be happy." When asked if he could set his own work hours, the following colloquy appears in Doughty's deposition testimony:

A. No, they more expected you to be at the office if you were working on a local project, you couldn't work from home, you had to work from the office. And they expected you there, kind of, eight to five.

Q. Okay. So, in your own opinion you, kind of, couldn't set your [- -] you couldn't go in at 10 o'clock or 11 o'clock and leave at three?

A. I mean you could, but I don't think the end results for you would have been very good, I believe you would be terminated.

Q. When you say 'terminated' that means terminated from that project?

A. Or let go, laid off.

Q. Laid off by Beta?

A. Right, yeah.

In addition to the time and place of the work functions dictated by Beta, as understood through Doughty's perspective, also relevant to the amount of control and supervision on the daily work schedule were questions posed to Doughty regarding his ability to take breaks during the typical workday. He responded: "Yeah, we had a breakroom where you could go get coffee, there was no structure as far as when you could and when you couldn't get coffee. But, I mean, there were times when people - - when you would hear them fussing at people going and sitting in the breakroom too long or eating lunch too long, things of that nature."

Part four of *Hickman*, 262 So.2d 385, looks to whether there was a specific price for the overall undertaking. In his contract with Beta, it is specified that Doughty was to make two hundred dollars a day, though that was not the rate Doughty was being paid at the time of the accident. Doughty was paid his full daily rate, regardless of whether he was in between projects or currently working on one. Doughty also testified that he was paid for a full day on the day of the

8

subject accident, which included spending the morning cleaning out Beta's Lutcher office location and not working the afternoon after the accident occurred. Beta was Doughty's sole source of employment, and Doughty testified he did not believe he could work for other companies without negative repercussions from Beta. Further, Doughty received pay raises throughout his tenure with the company, as acknowledged by Beta itself. According to Doughty, he was being paid two hundred and ninety dollars per day at the time of the accident.

The final factor to consider is whether the contract and work to be done is "for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach." *Hickman*, 262 So.2d at 390-91. Beta argues that the "specific time" refers to the start and conclusion of each project, noting that a specific time can be premised upon a future event which is certain to occur, although its exact time is uncertain. *See* La.Civ.Code art. 1778. However, Beta acknowledges that the contract was subject to termination by Beta at any time without liability for breach, providing:

> **5. TERMINATION:** This Agreement may be canceled by **BETA** at any time upon notice to **CONTRACTOR** and by the payment to the **CONTRACTOR** of the reasonable value of the work therefore completed, but not in excess of the full compensation for the completed work.

In *Hickman*, 262 So.2d 385, the supreme court held that the defendant was an employee and not an independent contractor, despite the existence of a contract stating otherwise. The court noted the defendant's limited freedom in performing his work and the employer's control over things such as the time for performance of his duties, as well as the order in which he performed them. The court also noted that defendant did not work with or contract to work with any other company. In its judgment, the *Hickman* court determined that the most telling factor in determining that the relationship was not one of an independent contractor was the

9

stipulation that the contract could be terminated by either party without incurring liability for breach, and further, could be terminated by the company at any time. The court found that the "right to terminate the relationship without cause, where no term of employment is prescribed, is characteristic of the master and servant or employer-employee relationship. The right is at the same time antagonistic to the independent contractor relationship." *Hickman*, 262 So.2d at 391.

In *Kibodeaux*, 4 So.3d 222, this court found that an electrical inspector was not an independent contractor despite having a contract stating otherwise. Using the *Hickman* factors, the court noted that the inspector was not called on to complete a specific piecework, such as the inspection or creation of a particular thing, but rather he performed many electrical inspections as well as other tasks assigned to him, much like Doughty. He was required to do his work in accordance with the rules, regulations, and instructions of the division for which he worked. He was given instructions on how to perform the work and was required to report back. He was also given tools and supplies with which to work. Further, the inspector's rate of pay changed for ongoing services, rather than there being a specific price for the entire project. Lastly, the court noted that the contract, like the one in this case, was terminable at will. Based upon its analysis, the *Kibodeaux* court found that the employment relationship did not meet the criteria for independent contractor status.

In *Hughes v. Goodreau*, 01-2107 (La.App. 1 Cir. 12/31/02), 836 So.2d 649, *writ denied*, 03-232 (La. 4/21/03), 841 So.2d 793, the first circuit employed the *Hickman* factors to determine if real estate agents were employees of the broker despite a written contract identifying the agents as independent contractors, noting that such a designation was not binding or controlling on the rights of third persons. In *Hughes*, the court noted that the broker did not dictate the number of hours to be

10

worked, the amount of properties to be overseen, or how associates were to spend their time while working. However, the court also noted that the associates worked exclusively for the broker and that they "were not free to carry out their work using their own methods because their written employment contract required that they 'comply with the Policy and Procedures Manual prepared by Broker.'" *Id.* at 659. The associates were required to attend an introductory orientation on the broker's policies, and referrals were considered the property of the broker. The contract could be terminated at any time by either party or could be terminated by the broker for breach. Based upon these facts, the court found that the agents were not independent contractors. *Id.*

Beta cites *Hulbert v. Democratic State Cent. Comm. of Louisiana*, 10-1910 (La.App. 1 Cir. 6/10/11), 68 So.3d 667, *writ denied*, 11-1520 (La. 10/7/11), 71 So.3d 316, in which the court ruled that the plaintiff was not an employee but an independent contractor. The court noted that the contract between the plaintiff and defendant, much like the instant case, could be terminated without cause, which is characteristic of an employee-employer relationship. *Id.* However, following a full analysis of the *Hickman* factors, the court found that "there are a number of factors the court must consider in determining whether an independent contractor relationship exists; no one factor is controlling, and the court must consider the totality of the circumstances." *Id.* at 672.

Beta notes that all payments made to Doughty were in the form of 1099s, and that no taxes were withheld. *See Collins v. Joseph*, 250 So.2d 796 (La.App. 4 Cir. 1971). Additionally, Doughty never received any benefits or obtained medical insurance through Beta. Beta asserts that the totality of the circumstances in this instance clearly show that Doughty was an independent contractor. We disagree.

11

"The principal test in determining whether a relationship is an employer-employee relationship or a principal-independent contractor relationship is control over the work." *Hulbert*, 68 So.3d at 670. Beta urges that it was only the end product, or services to be rendered, that was directly controlled and supervised, asserting that Doughty could go a whole week to a month without instruction from a project manager. Doughty acknowledged as much; however, in addition to the testimony highlighted above, Doughty also testified that the amount of supervision Beta exerted varied, stating:

> A    Depended on the project, I guess, at times. Some projects had more direct supervision than others, I would say.
>
> Q    What [do] you mean by more direct supervision?
>
> A    I guess, more like you said, if you were just going and researching everyday then you would probably have less direct day-to-day supervision. But some projects due diligence, in particular, you were pretty much supervised on a day-to-day basis just because they were, I guess, more time sensitive.

"[I]t is not the supervision and control *actually exercised* which is significant, but whether, from the nature of the relationship, the right to exercise such control exists." *Id.* at 670 (alterations in original). While Doughty may have worked on projects for Beta with minimal supervision, it is clear that Beta retained the right to exercise control as evidenced by it asserting this right on certain projects and at various times. Doughty testified that he was required to be in the office every day from 8 A.M. until 5 P.M. He specifically testified to his belief that deviation from this schedule would lead to termination by Beta. Beta was Doughty's sole source of employment from December 2010 until the subject accident, as he simply moved from one project to the next. He further testified to his belief that concurrent work for other employers would lead to termination by Beta. Doughty was required to attend two weeks of training on compliance with Beta's policies

12

and was given office supplies and a computer by Beta. *See Hughes*, 836 So.2d 649. Further, there was no specific price for the overall undertaking. *See Hickman*, 262 So.2d 385. Instead, Beta raised Doughty's daily rate of pay for services that were ongoing, akin to pay raises, rather than there having been a set price for a specific project or overall undertaking. *See Kibodeaux*, 4 So.3d 222. The daily payment arrangement when considered with the required work time schedule more closely resembles a true employer-employee relationship rather than a pincipal-independent contractor relationship whereby the contractor is paid a set price for a given project. *See Hickman*, 262 So.2d 385. None of these specific facts are in dispute given our thorough review of the pleadings, motions, and exhibits filed in support and in opposition of the summary judgment motions.

Finally, the most revealing fault in Beta's contention that Doughty was an independent contractor is the stipulation that the contract could be terminated by Beta upon notice without incurring liability for breach. The Louisiana Supreme Court has recognized that:

> "[T]he most telling facts defining the relationship as master-servant (rather than that of employer-independent contractor) were that the contract between the parties could be terminated by either party upon written notice to the other without incurring liability for breach; and that the employer had the right to terminate the relationship at any time when the employee's services became unsatisfactory to the employer."

*Hughes*, 836 So.2d at 658-59. "This right to terminate the relationship without cause, where no term of employment is prescribed, is characteristic of the master and servant or employer-employee relationship. The right is at the same time antagonistic to the independent contractor relationship." *Hickman*, 262 So.2d at 391. In this case, Beta reserved the right in the contract to terminate Doughty's work for the company without regard to any specific project, and without liability for breach of contract. According to the terms of the contract between them,

13

Doughty would only be eligible to recover his daily compensation through the date of termination, much akin to an at-will employer-employee relationship.

When determining whether an independent contractor relationship exists, the court must consider a number of factors and make a judgment based upon the totality of the circumstances. *Hulbert*, 68 So.3d 667. The evidence submitted in this case consists entirely of Doughty's deposition testimony, the employment contract between Beta and Doughty, and an affidavit signed by Doughty before he began performing work for Beta. Based upon the facts presented, it is clear that Doughty did not have an independent contractor relationship with Beta, but rather was working as an employee of Beta for the purposes and rights of third parties.

Additionally, as asserted in Plaintiff's second assignment of error, Doughty was not acting as an independent contractor on the day of the accident but was on a mission for Beta. An employer's vicarious liability for conduct not his own extends only to the employee's tortious conduct which is within the course and scope of employment. *Orgeron v. McDonald*, 93-1353 (La. 7/5/94), 639 So.2d 224. The Louisiana Supreme Court has noted that "'[A]n employee traveling to or returning from a special mission is acting in the course of employment.'" *McLin v. Indus. Specialty Contractors, Inc.*, 02-1539, pp. 8-9 (La. 7/2/03), 851 So.2d 1135, 1142. For a mission to qualify as a special mission and thus be considered as employment-related rather than personal, an employee is deemed to be in the course of employment when he is engaged in the direct performance of duties assigned (or requested, directed, instructed or required) by his employer. *Biscamp v. Sysco E. Texas*, 46,182 (La.App. 2 Cir. 4/13/11), 63 So.3d 1097.

At the time of the subject accident, Doughty was on his way to Beta's office location in Lafayette from Lutcher, Louisiana, where he had spent the morning cleaning out a Beta field office with a Beta supervisor. Doughty had been asked to

14

clean out the field office due to its proximity to his residence. Doughty had been working out of the Lafayette office for two weeks prior to the subject collision and commuted there from his residence in Denham Springs.

On the morning in question, Doughty had been asked to go to the Lutcher field office before going to Lafayette. Doughty met a Beta supervisor there, worked for a couple of hours cleaning out the office, and packed up extra supplies into his vehicle to be transported to Beta's Lafayette location. He acknowledges that he could have refused, in which case Beta would have sent someone else to do it. Beta asserts that Doughty volunteered to pick up the supplies, that he was not required to do so but was merely asked. However, the supreme court has found that "when an employee is **requested,** directed, instructed, or required by the employer to be away from the place of employment, the employee is deemed to be in the course of employment because the employee is engaged in the direct performance of duties assigned by the employer." *McLin*, 851 So.2d at 1143 (emphasis added).

We also find no merit to Beta's repeated assertion that because Doughty would have been commuting from Denham Springs to the Beta office in Lafayette that day, his driving from the Lutcher office to the Lafayette office cannot have been a mission for the company. His actions provided a direct benefit to Beta and he was clearly not on a personal pursuit. If an employee is on a special mission, he is within the course of his employment from portal-to-portal or, in other words, from his home to the location of the mission, or alternatively, from the location of the mission to his home. *Id.* While we note that an employer is generally not liable for acts committed by its employee while the employee is going to or coming from work, Doughty was not on his way to work. He was already at work, leaving Beta's field office and returning to its main office to deposit the extra

15

supplies from the Lutcher location. In fact, after the accident, Doughty continued on to the Beta office location and unloaded the supplies and was paid his full daily rate despite leaving soon after doing so. "We can find no support for the proposition that, because an employee happens to travel along his usual route while returning []from a special mission, the employee ceases to be protected under the exception." *Id.* at 1143.

As such, we reverse the judgment of the trial court granting Beta's motion for summary judgment. Further, we grant Plaintiff's motion for partial summary judgment, finding Beta vicariously liable for the actions of its employee, Doughty, on the date of the subject accident. Plaintiff's remaining assignment of error is dismissed as moot.

## DISPOSITION

Based upon the foregoing, we reverse the judgment of the trial court which granted Beta's motion for summary judgment on the issue of vicarious liability and the finding that Jeffrey Doughty was an independent contractor. Further, we grant Brock Simon's motion for partial summary judgment, finding Jeffrey Doughty was not working as an independent contractor on the date of the subject accident and Beta is vicariously liable for his actions. This matter is remanded to the trial court for proceedings in accordance herewith. All costs of this appeal are assessed to appellee, Beta Land Services, Inc.

**REVERSED, RENDERED, AND REMANDED.**